J-A20034-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| DONNA L. MEANOR, AS EXECUTOR OF THE ESTATE OF ROBERT WAGNER, SR., DECEASED; FAIRMAN DRILLING COMPANY; ALAN R. FAIRMAN; SANDRA R. FAIRMAN; RONALD R. FAIRMAN; BEVERLY A. FAIRMAN; RICHARD M. FAIRMAN; GARY D. FAIRMAN; FRANK G. FAIRMAN;TERRY L. FAIRMAN; WILLIAM WOOD AND BETTY WOOD, HIS WIFE; DOLORES M. WAGNER; DOLORES J. WAGNER; COUNTY-WIDE REAL ESTATE COMPANY, INC.; B. LEONARD BRODY; PATRICK F. MCCARTHY; E. JAMES TRIMARCHI; DAVID R. TOMB; WAGNER AND WAGNER; JAMES CARSON AND SUSAN CARSON, HIS WIFE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| PEOPLES NATURAL GAS COMPANY, LLC, AS SUCCESSOR BY MERGER TO EQUITABLE GAS COMPANY, A DIVISION OF THE FORMER EQUITABLE RESOURCES, INC. | |
| APPEAL OF:  DONNA L. MEANOR, AS EXECUTOR OF THE ESTATE OF ROBERT WAGNER, SR., DECEASED, FAIRMAN DRILLING COMPANY, ALAN R. FAIRMAN, SANDRA R. FAIRMAN, RONALD L. FAIRMAN, BEVERLY A. FAIRMAN, DOLORES M. WAGNER, AND DOLORES J. WAGNER | No. 1757 WDA 2017 |

Appeal from the Judgment Entered October 23, 2017
in the Court of Common Pleas of Indiana County,
Civil Division at No(s):  2007-11360

DONNA L. MEANOR, AS EXECUTOR : IN THE SUPERIOR COURT OF
OF THE ESTATE OF ROBERT : PENNSYLVANIA
WAGNER, SR., DECEASED; FAIRMAN :
DRILLING COMPANY; ALAN R. :
FAIRMAN; SANDRA R. FAIRMAN; :
RONALD R. FAIRMAN; BEVERLY A. :
FAIRMAN; RICHARD M. FAIRMAN; :
GARY D. FAIRMAN; FRANK G. :
FAIRMAN;TERRY L. FAIRMAN; :
WILLIAM WOOD AND BETTY WOOD, :
HIS WIFE; DOLORES M. WAGNER; :
DOLORES J. WAGNER; COUNTY- :
WIDE REAL ESTATE COMPANY, INC.; :
B. LEONARD BRODY; PATRICK F. :
MCCARTHY; E. JAMES TRIMARCHI; :
DAVID R. TOMB; WAGNER AND :
WAGNER; JAMES CARSON AND :
SUSAN CARSON, HIS WIFE :
                                        :
         v.                             :
                                        :
PEOPLES NATURAL GAS COMPANY, :
LLC, SUCCESSOR BY MERGER TO :
EQUITABLE GAS COMPANY, LLC :
F/K/A EQUITABLE GAS COMPANY, A :
DIVISION OF THE FORMER :
EQUITABLE RESOURCES, INC. :
                                        :
                                        : No. 1786 WDA 2017

Appeal from the Judgment Entered October 23, 2017
in the Court of Common Pleas of Indiana County,
Civil Division at No(s):  2007-11360

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:            FILED JANUARY 23, 2019

Donna L. Meanor, As Executor of the Estate of Robert Wagner, Sr.,

Deceased ("Meanor"), Fairman Drilling Company, Alan R. Fairman, Sandra R.

Fairman, Ronald R. Fairman, Beverly A. Fairman, (collectively, "the Fairman

Plaintiffs"), Dolores M. Wagner, and Dolores J. Wagner (collectively, "the

- 2 -

Plaintiffs")[1] appeal from the Judgment entered following a nonjury trial wherein the trial court found Peoples Natural Gas Company, LLC, successor by merger to Equitable Gas Company, LLC, f/k/a Equitable Gas Company, a Division of the Former Equitable Resources, Inc. ("Peoples"), had breached a contract to purchase natural gas, but did not award damages on the breach of contract claim. Peoples filed a cross-appeal from the Judgment. We affirm in part and vacate in part, and remand with instructions.

> The trial court set forth the relevant underlying facts as follows:
>
> On July 3, 1995, Wagner & Wagner[fn], as Seller, entered into Gas Purchase Agreement No. 2075 (hereinafter "GPC 2075") with Apollo Gas Company (hereinafter "Apollo"), as Buyer. Pursuant to GPC 2075, Apollo agreed to buy all natural gas produced by Seller from the wells on the Wagner family property.[fn2]
>
> [fn] Wagner & Wagner was a joint business venture between brothers Robert and Homer Wagner.
>
> [fn2] GPC 2075 specifies six (6) different natural gas wells from which the Buyer will purchase all produced natural gas. A seventh natural gas well located on the property was subsequently covered by the terms of GPC 2075, beginning on November 1, 1995.
>
> This contract was negotiated and signed by Homer Wagner, and the payee of all sums to be paid was specified as "Homer Wagner, Agent." Within the Fourth enumerated provision of GPC 2075, the Buyer's obligation to purchase natural gas in regard to market

---

[1] We note that the trial court added as indispensable parties, William Wood and his wife, Betty Wood; County-Wide Real Estate Company, Inc.; B. Leonard Brody; Patrick F. McCarthy; E. James Trimarchi; David R. Tomb; Wagner & Wagner; and James Carson and his wife, Susan Carson. While these parties have an interest in the gas wells, they have not filed appellate briefs and are not parties to this appeal. See Trial Court Opinion, 7/11/17, at 2 n.1 (noting that "[t]he remaining plaintiffs were not individually represented.").

conditions is detailed; this provision is known as a "market-out" clause. The Fourth provision states in relevant part:

BUYER's agreement to purchase natural gas hereunder is expressly made subject to BUYER's ability to fully recover the entire purchase price paid SELLER, as such ability of BUYER may be affected by any order, opinion, enactment or regulation of any governmental authority or any court.

BUYER's agreement to purchase natural gas hereunder is further subject to BUYER's willingness to pay the applicable contract price in light of the market and economic conditions prevailing from time to time.

GPC 2075 then establishes a "Posted Price" price term. The Sixth enumerated provision of said agreement states that "[t]he price to be paid by BUYER to SELLER for the gas purchased under this Agreement shall be BUYER's then effective POSTED PRICE for the class of gas delivered under this contract." The Sixth provision further states that:

BUYER'S POSTED PRICE is established from time to time by notice published by BUYER to its several sellers and to natural gas producers generally in the area of BUYER's system....

As BUYER'S POSTED PRICE is changed from time to time, BUYER shall forward notice thereof to SELLER by depositing such notice in the mails, postage prepaid, at BUYER'S office. This Agreement shall be deemed amended as to price upon the depositing in the mails of each of said notices.

The parties do not dispute that Apollo's "Posted Price" for gas at the time GPC 2075 was executed was $1.60 per Mcf.[fn3] About three months prior to the execution of GPC 2075, on April 12, 1995, Apollo issued "Notice to Natural Gas Producers in the State of Pennsylvania of Posted Price" (hereinafter "1995 Posted Price Notice") setting its "Posted Price" at $1.60 per Mcf. Th[e 1995 Posted Price] Notice states, in relevant part, that:

Effective with the meter reading of April, 1995, and remaining until changed by the Company, Apollo Gas Company is announcing its "Posted Price" of $1.60/Mcf for qualified producers in the state of Pennsylvania.

- 4 -

The existing "Posted Price" of $1.60/Mcf is being established in order to maintain the Company's gas acquisition practice of purchasing least cost gas while striving to avoid shut-in of local production. ...

[fn3] "Mcf is an abbreviation denoting a thousand cubic feet of natural gas. A natural gas well that produces 400 Mcf of gas per day operates with a daily production rate of 400,000. A single Mcf is equal to approximately 1,000,000 Btu (British thermal units) of energy. The "M" in MCF comes from the ancient Roman letter M, which stood for one thousand." INVESTOPEDIA, [Mcf], http://www.investopedia.com/terms/m/mcf.asp#ixzz4IKLrsV18 (last visited Jun. 28, 2017).

In November 1995, Apollo began paying to Wagner & Wagner for gas produced from its wells at a rate of $1.60 per Mcf. This payment and its associated check was accepted and cashed.

Carnegie Natural Gas Company (hereinafter "Carnegie") acquired Apollo via a merger in early 1996. Carnegie continued to pay the "Posted Price" of $1.60 per Mcf through November 1999. All payments and checks from November 1995 to November 1999 were accepted and cashed. Carnegie then increased its "Posted Price" and began paying $1.80 per Mcf during production month December 1999. Plaintiffs assert that they never received the required notice of any "Posted Price" or change in "Posted Price." Equitable Resources, Inc., (hereinafter "Equitable") acquired Carnegie on December 15, 1999. Equitable continued to pay $1.80 per Mcf through production month January 2004. All associated payments and checks during this period were accepted and cashed.

Equitable continued to issue a total of 65 checks at $1.80 per Mcf to "Homer Wagner, Agent," which covered production months February 2004 through June 2009. The Executrix of the Estate of Homer Wagner, Dolores M. Wagner, did not cash these checks. In August 2009, Equitable ceased issuing the payments and began to internally account for the payments at $1.80 per Mcf. A total of 52 payments were accounted for internally by Equitable for production months July 2009 to October 2013.

The [P]laintiffs consist of those who have interests in the natural gas wells drilled and producing on the Wagner Family Properties. Several members of the Wagner family possess interests in the

at-issue gas wells. Robert N. Wagner is one such individual. Throughout the years—including as far back as 1997-Robert N. Wagner objected to GPC 2075. In several letters written and sent over a period of years[,] he stated that the contract was fraudulent and that the incorrect price was being paid. He also requested that all future payments be made to him, and not to Homer Wagner, as agent. Original Wagner & Wagner agent and contract negotiator, Homer M. Wagner, died on August 3, 2003. His wife, Dolores M. Wagner, was appointed as the Executrix of his estate. Plaintiff Fairman Drilling Company possesses a 50% interest in the wells covered by GPC 2075.

Robert Wagner initiated this suit on July 19, 2007, via a Praecipe for Writ of Summons. Most of the other plaintiffs were involuntarily joined by this Court on July 18, 2012. Original plaintiff Robert Wagner died on March 16, 2014. Donna L. Meanor was appointed the Executor of the Estate of Robert Wagner, and then was formally substituted for Robert N. Wagner on April 30, 2014. Via their March 5, 2012[] Complaint, Plaintiffs assert two causes of action: Breach of Contract and Unjust Enrichment. Plaintiffs are seeking the difference between the $1.80 per Mcf payments and the market price of natural gas per Mcf for production months July 1995 to July 2015, in the amount of $1,421,511.00.[fn4] [Equitable filed an Answer and New Matter.]

[fn4] In her Post-Trial Brief, plaintiff Donna L. Meanor, as Executor of the Estate of Robert Wagner, Sr., Deceased, seeks damages in the amount of $1,421,511.00. In their Post-Trial Brief, the Fairman [P]laintiffs seek damages in the amount of $1,560,000.00. The Fairman [P]laintiffs explain that this amount represents a reasonable contract price for gas from February 2004 through December 2016, plus interest and accruing damages. Both figures are based on Plaintiffs' expert's calculations.

On December 17, 2013, Equitable Gas Company, LLC, was merged into Peoples Natural Gas Company, LLC[] (hereinafter "Peoples"). Peoples has succeeded to the rights under GPC 2075 and has continued to internally account for the gas produced under GPC 2075 at $1.80 Mcf. Peoples has accounted for a total of 38 suspended payments between production months November 2013 and December 2016. [Peoples filed a Motion for Summary Judgment, which the trial court denied.]

This matter proceeded to trial on January 21, 2017. At trial, the [trial c]ourt heard testimony from several lay witnesses and two experts. First, the [trial c]ourt heard testimony from Ronald Fairman, the President of Fairman Drilling Company. The [trial c]ourt then heard from plaintiff James Carson, owner of the land on which the wells are located, and a 30[-]year employee of Fairman Drilling Company. The [trial c]ourt then heard from Dolores J. Wagner, ex-wife of Robert Wagner, and from Dolores M. Wagner, known as "D," the widow of Homer Wagner. Of particular importance to the [trial c]ourt is the testimony of the two expert witnesses in this matter. Plaintiffs' expert, William E. Roach [("Roach")], is a chemical/petroleum engineer. He provided testimony regarding the delta (or difference) between the $1.80 per Mcf price paid and the market prices for the years of payments in dispute in this case. Defendant's expert, Benjamin Schlesinger, Ph.D. [("Dr. Schlesinger")], currently works as a natural gas industry consultant. Dr. Schlesinger provided testimony regarding the meaning of the term "Posted Price" as used in contracts in the natural gas industry.

Trial Court Opinion, 7/11/17, at 2-9 (footnotes in original).

Following a hearing, the trial court found Peoples had breached GPC 2075 by failing to properly specify a "Posted Price." However, the trial court also found Plaintiffs failed to prove identifiable damages, and concluded that any damage award would be speculative. The trial court further found that Plaintiffs' unjust enrichment claim failed as a matter of law. Peoples, Meanor and the Fairman Plaintiffs filed timely Motions for Post-Trial Relief. The trial court denied the Motions. Subsequently, Judgment was entered on October 23, 2017. Plaintiffs filed a joint timely Notice of Appeal. Peoples filed a cross-appeal. Thereafter, Plaintiffs and Peoples filed court-ordered Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statements.

On appeal, Plaintiffs raise the following questions for our review:

1. Whether after determining that [Peoples] breached [GPC 2075] by failing to establish a "Posted Price," the trial court should have substituted a "reasonable price" in accordance with the Pennsylvania Uniform Commercial Code [("UCC")]?

2. Whether after determining that [Peoples] breached [GPC 2075] by failing to establish a "Posted Price," the Plaintiffs[] presented unrefuted evidence of their loss calculations, entitling the Plaintiffs to damages?

Brief for Meanor at 5.[2]

On cross-appeal, Peoples raises the following questions for our review:

1. Does the record support a finding that Peoples (and its predecessors) breached GPC [] 2075?

2. Did the trial court correctly determine that Plaintiffs had failed to offer sufficient evidence for the [trial c]ourt to properly fashion a damages award where they failed to offer any evidence as to how the "Posted Price" term contained in the contract related to market forces, how often it was required to change (if at all), and how to account for those factors that significantly impact the amount due under a "market-based" contract such as post-meter deductions?

Brief for Peoples at 1-2.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error

_____

[2] We note that the Fairman Plaintiffs filed a separate brief, which includes a Statement of Questions substantially similar to Meanor's brief. See Brief for Fairman Plaintiffs at 5. Because of the similarity, we will not restate the questions herein.

of law. However, where the issue concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

Stephan v. Waldron Elec. Heating and Cooling LLC, 100 A.3d 660, 664–65 (Pa. Super. 2014) (citation, brackets and ellipses omitted).

We will first address Peoples's claim challenging the trial court's finding that it breached GPC 2075. Peoples contends that the evidence of record does not support the allegations of breach of contract made in the Complaint. Brief for Peoples at 25-27, 34-35. Peoples initially argues that the trial court abused its discretion in finding that the "Posted Price" term in GPC 2075 was ambiguous. Id. at 27-28. Peoples asserts that while GPC 2075 does not define "Posted Price," its expert, Dr. Schlesinger, indicated that "Posted Price" is a term of art in the gas industry that is defined as "a posting [set by the buyer] that reflects the standing offer to buy gas at that posted price." Id. at 30; see also id. at 26-28, 29, 31-32, 34-35 (arguing that the Plaintiffs offered no expert opinion to controvert the meaning of "Posted Price," and that when the parties entered into GPC 2075, they chose to incorporate this term of art with a well-defined meaning). Peoples further asserts that under the well-accepted definition of "Posted Price," there was no obligation to change or adjust the "Posted Price." Id. at 28, 30, 34; see also id. at 33 (arguing that the buyer has the "sole right to post the price it will pay for gas."). Peoples

claims that a "Posted Price" is an alternative to a "market-price contract," and is not tied to fluctuating market prices. Id. at 32, 33-34.[3]

"[A] lease is in the nature of a contract and is controlled by principles of contract law." T.W. Phillips Gas & Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012). "[T]he interpretation of any contract is a question of law and this Court's scope of review is plenary[, and] we need not defer to the conclusions of the trial court and are free to draw our own inferences." Seneca Res. Corp. v. S & T Bank, 122 A.3d 374, 380 (Pa. Super. 2015) (citation omitted). "To show a breach of contract, a party must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." McCausland v. Wagner, 78 A.3d 1093, 1101 (Pa. Super. 2013) (citation and quotation marks omitted).

A contract "must be construed in accordance with the terms of the agreement as manifestly expressed, and the accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." Id. (citation, quotation marks, and brackets omitted). "When construing agreements

_____

[3] Peoples also claims that the Plaintiffs waived their breach of contract claim because they accepted payments without objection for many years. Brief for Peoples at 35-38. However, we decline to find the claim waived. Here, objections to the pricing were made through letters sent in 2003. Further, the fact that checks were cashed between 1999 and 2004 does not in and of itself demonstrate acceptance of the price of gas. Indeed, GPC 2075 only required a change to the "Posted Price" from time to time.

involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation." Seneca Res. Corp., 122 A.3d at 380 (citation omitted).

> In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract. If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.
>
> [T]he parol evidence rule does not apply in its ordinary strictness where the existence of a custom or usage to explain the meaning of words in a writing is concerned. Where terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter.... [I]n the absence of an express provision to the contrary, custom or usage, once established, is considered a part of a contract and binding on the parties though not mentioned therein, the presumption being that they knew of and contracted with reference to it.
>
> ... Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade. ...
>
> There is no requirement that an ambiguity be shown before usage can be shown, and no prohibition against showing that language or conduct have a different meaning in the light of usage from the meaning they might have apart from the usage. The normal effect of a usage on a written contract is to vary its meaning from the meaning it would otherwise have.

*Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001)

(citations and quotation marks omitted).

As noted above, GPC 2075 states, in relevant part, the following:

FOURTH: ... BUYER'S agreement to purchase natural gas hereunder is further subject to BUYER'S willingness to pay the applicable contract price in light of the market and economic conditions prevailing from time to time.

* * *

SIXTH: ... The price to be paid by BUYER to SELLER for the gas purchased under this Agreement shall be BUYER'S then effective POSTED PRICE for the class of gas delivered under this contract. ...

BUYER'S POSTED PRICE is established from time to time by notice published by BUYER to its several sellers and to natural gas producers generally in the area of BUYER's system. A copy of the currently effective POSTED PRICE notice is attached hereto and made a part hereof.

As BUYER'S POSTED PRICE is changed from time to time, BUYER shall forward notice thereof to SELLER by depositing such notice in the mails, postage prepaid, at BUYER'S office. This Agreement shall be deemed amended as to price upon the depositing in the mails of each of said notices.

GPC 2075, 7/3/95, at 4-5 (unnumbered). GPC 2075 does not define the term

"Posted Price" or "time to time."

Here, the trial court accepted the uncontroverted testimony of Dr.

Schlesinger,[4] the expert witness for Peoples, indicating that the term "Posted Price" in GPC 2075 is a term of art in the natural gas industry. See id. at 14; N.T., 1/31/17, at 132 (wherein Dr. Schlesinger testified that "Posted Price" is a term of art in the oil and gas industries).[5] Here, the trial court found credible Dr. Schlesinger's definition of "Posted Price" as the "[p]rice for oil or gas in a given area, set by principal buyers. Price[] [is] available to [any] energy producer in the area." N.T., 1/31/17 at 133; Dr. Schlesinger Letter, 7/13/16,

_____

[4] The trial court detailed Dr. Schlesinger's background in the oil and gas industry as follows:

> Dr. Schlesinger … works as the president of Benjamin Schlesinger and Associates, LLC, a natural gas and oil consulting firm. As a consultant, Dr. Schlesinger performs/provides market research, advisory services, contract review and negotiation, and litigation support, particularly on oil and gas issues such as gas pricing. Dr. Schlesinger earned his Ph.D. in Industrial Engineering from Stanford University[.]

Trial Court Opinion, 7/11/17, at 13-14.

[5] In interpreting GPC 2075, the trial court erroneously found that the term "Posted Price" was also ambiguous. See Trial Court Opinion, 7/11/17, at 12-13. Thus, while the trial court admitted evidence regarding the interpretation of GPC 2075 based upon a purported ambiguity, such admission was not error where the trial court was free to admit evidence that the term "Posted Price" in GPC 2075 is a widely used and well-accepted term in the natural gas industry. See Sunbeam Corp., 781 A.2d at 1193.

at 4; see also Trial Court Opinion, 7/11/17, at 13, 16.[6] Thus, based upon the plain language contained in GPC 2075, and the credible definition of the term as accepted in the oil and gas industry, the buyer sets the "Posted Price" based upon where the gas is produced.[7] While Peoples ostensibly argues that the determination of whether there was a breach of GPC 2075 turns on the definition of "Posted Price," in actuality, the parties are disputing whether the buyer (Peoples), in setting the "Posted Price," was obligated to change the price from "time to time."

Here, the trial court determined that under the plain language of GPC 2075, the parties intended to change the "Posted Price" from "time to time" due to market forces. See Trial Court Opinion, 7/11/17, at 16-17. The trial court found that while the term "Posted Price" was not meant to be the market price of natural gas, it was also not characterized as a fixed price. See id. at

_____

[6] Dr. Schlesinger also provided two other definitions of "Posted Price" as used in the oil and gas industry. Dr. Schlesinger defined the use of "Posted Price" in oil production, and in instances where the seller sets the price. See N.T., 1/31/17, at 133-34; Dr. Schlesinger Letter, 7/13/16, at 4; see also Trial Court Opinion, 7/17/11, at 14-15. The trial court, in light of the language of GPC 2075, determined that Dr. Schlesinger's above definition of "Posted Price" was credible and applicable to GPC 2075. See Trial Court Opinion, 7/17/11, at 16.

[7] The trial court noted that the "purpose of the 'Posted Price' is to achieve the goal of purchasing least cost natural gas while avoiding shut-ins, and it is available to all producers in the area." Trial Court Opinion, 7/17/11, at 15-16.

16, 17. The trial court found that Peoples breached GPC 2075 by failing to change the "Posted Price," stating as follows:

> In order to ascertain whether or not [Peoples] breached GPC 2075 by failing to pay the "Posted Price" as properly defined, the [trial c]ourt looks no further then [sic] to [Peoples's] own admissions. Included amongst the joint trial exhibits of all parties is [Peoples's] Objections and Responses to Plaintiffs' First Set of Interrogatories …. Therein, in response to Interrogatories 2, 3, 4, 6, [Peoples] repeatedly states, with some minor variations, that "Peoples responds that it/Equitable does not have a 'Posted Price' for natural gas."
>
> The admission that Equitable/Peoples did not and does not have a "Posted Price" is telling. When Equitable succeeded to the rights of GPC 2075, it simply continued to pay the then existing price of $1.80 [per] Mcf. This price never changed because [Peoples] does not have a "Posted Price." The [trial c]ourt finds that [Peoples] is and has been treating GPC 2075 as a fixed price contract. If the original parties to GPC 2075 wanted a fixed price contract at $1.60 per Mcf (or $1.80 per Mcf for that matter), the [trial c]ourt must assume they would have done so; they did not. GPC 2075 is not, nor has it ever been, a fixed price contract. By [Peoples's] expert Dr. Schlesinger's own testimony[,] "Posted Price" is not a fixed price contract, but rather only "a standing offer to buy (or sell) gas at that price." Peoples has unilaterally turned GPC 2075 into a fixed price contract due to their complete failure to have a "Posted Price." This is not what the parties intended and constitutes a breach of contract.

Id. at 17-18.

Upon our review of GPC 2075, and the relevant record, we agree with the trial court's reasoning. GPC 2075 clearly and unequivocally states that the "Posted Price" will be changed occasionally based upon market and economic forces. See GPC 2075, 7/3/95, at 4. Peoples admitted to failing to change the "Posted Price" based upon market and economic forces. We decline to accept Peoples's argument that under the above definition of

"Posted Price," it was under no obligation to change or adjust the "Posted Price." See, e.g., N.T., 1/31/17, at 138 (wherein Dr. Schlesinger states that the buyer is not obligated to change the "Posted Price" absent "some mechanism"). Indeed, Peoples ignores the mechanism in the plain language of GPC 2075 that directed it to change the "Posted Price" from "time to time." We must give effect to all provisions of GPC 2075. See Com. ex rel. Kane v. UPMC, 129 A.3d 441, 463-64 (Pa. 2015) (noting that a contract must be construed, if possible, to give effect to all of its terms). Thus, based upon the foregoing, we conclude that Peoples breached GPC 2075.

We will now address the damages claims raised by Plaintiffs. Plaintiffs contend that the trial court erred in failing to award damages on the breach of contract. Brief for Meanor at 16; Brief for Fairman Plaintiffs at 22. Plaintiffs argue that mere uncertainty in the amount of damages is not a bar to recovery, where Peoples clearly caused the breach by failing to change the "Posted Price" from time to time, and the resultant damages. Brief for Meanor at 14; Brief for Fairman Plaintiffs at 24, 25-26, 28-29, 30, 35. Plaintiffs assert that they provided the trial court with a method to calculate damages with reasonable certainty. Brief for Meanor at 17; Brief for Fairman Plaintiffs at 22, 26, 29, 31. Plaintiffs further assert that market value may be used to determine a reasonable price, as market price influences the pricing terms in a "Posted Price." Brief for Meanor at 20-21, 22; Brief for Fairman Plaintiffs at 26-27, 33-34. Plaintiffs argue that the difference between the "Posted Price"

and market price from 1995 to 2015 was approximately $1,560,000. Brief for Meanor at 23; Brief for Fairman Plaintiffs at 26-27, 31-32.

Plaintiffs also claim that the trial court erred in determining that it needed evidence as to a proper "Posted Price" for the time period in question, and that market price could not be used in calculating damages. Brief for Meanor at 17, 20-21; Brief for Fairman Plaintiffs at 22. Plaintiffs point to section 2305 of the UCC, Open Price Term, which purportedly allows Plaintiffs to fix a reasonable price for the gas produced under GPC 2075 due to Peoples's bad faith in failing to properly set the "Posted Price." Brief for Meanor at 18; Brief for Fairman Plaintiffs at 23-24, 26. Plaintiffs argue that the trial court erred in finding that section 2305 is inapplicable to this case, as the use of a "Posted Price" in setting the price of the gas does not constitute bad faith. Brief for Meanor at 19-20; Brief for Fairman Plaintiffs at 25. Plaintiffs claim that Peoples was obligated to act in good faith, and that the use of a "Posted Price" does not automatically satisfy this requirement. Brief for Meanor at 20; Brief for Fairman Plaintiffs at 24-25. Plaintiffs contend that its calculation of damages was uncontroverted, and that it provided the trial court with a reasonable price for damages. Brief for Meanor at 24; Brief for Fairman Plaintiffs at 22, 32.

> Damages for a breach of contract should place the aggrieved party in as nearly as possible in the same position it would have occupied had there been no breach. To that end, the aggrieved party may recover all damages, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the

parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

Ely v. Susquehanna Aquacultures, Inc., 130 A.3d 6, 10 (Pa. Super. 2015) (brackets, citations, and quotation marks omitted). Further, "[a]s a general rule, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988). However,

> [t]here should be no doubt that recovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred. It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct. … The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach.

Id. (citation omitted).

We must first determine whether the UCC governs the award of damages at issue in this case. The UCC is intended to be a "semi-permanent and infrequently-amended piece of legislation," and "is intended to make it possible for the law embodied in the [UCC] to be applied by the courts in the light of unforeseen and new circumstances and practices." 13 Pa.C.S.A. § 1103, cmt. 1. The Legislature directed that the UCC

> must be liberally construed and applied to promote its underlying purposes and policies, which are:
>
> (1) to simplify, clarify and modernize the law governing commercial transactions;

(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and

(3) to make uniform the law among the various jurisdictions.

Id. § 1103(a). "The text of each section [of the UCC] should be read in the light of the purpose and policy of the rule or principle in question, as also of the [UCC] as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved." Id. § 1103, cmt.

In relevant part, section 2305 of the UCC states the following:

(a) General rule.--The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:

...

(2) the price is left to be agreed by the parties and they fail to agree[.]

...

(b) Price to be fixed by party.--A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(c) Price not fixed through fault of party.--When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

13 Pa.C.S.A. § 2305; see also id. § 1201(b)(20) (defining "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing."). Further, comment 3 of section 2305 elucidates subsection (a)(2) as follows:

3. Subsection (2), dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103). But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

Id. § 2305, cmt. 3.

The trial court found that section 2305 of the UCC was inapplicable to the instant case, thereby precluding Plaintiffs from setting a reasonable price. Trial Court Opinion, 7/11/17, at 24. The trial court specifically found that comment 3 to section 2305 indicates that the use of a "Posted Price" satisfied the good faith requirement. Id. at 24-25; see also id. at 25 (noting that the reference to "Posted Price" in comment 3 of section 2305 "unequivocally excludes the application of [s]ection 2305 to a "Posted Price" contract.").

Upon our review, we conclude that the trial court's interpretation of section 2305 is overly broad in light of the fact that the drafters of the UCC utilized "normal case," instead of "all cases." See Allapattah Servs., Inc. v. Exxon Corp., 61 F. Supp. 2d 1308, 1320 (S.D. Fla. 1999) (stating that "the words 'in the normal case' mean that, although a posted price will usually be satisfactory, it will not be so under all circumstances.") (citation omitted). While the UCC does not define "normal case," the good-faith presumption for a "Posted Price" was meant to apply broadly to avoid litigation on open-price terms. See, e.g., Autry Petroleum Co. v. BP Prod. N. Am., Inc., 334 F.

App'x 982, 985 (11th Cir. 2009) (accepting "that the draftsmen of the UCC intended that the safe harbor created by the normal case good faith presumption apply broadly lest every price set pursuant to an open-price term be vulnerable to attack and subject to litigation."); Flagler Auto., Inc. v. Exxon Mobil Corp., 582 F. Supp. 2d 367, 378 (E.D.N.Y. 2008) (noting that under section 2305, the drafters sought "to eliminate litigation over prices that are nondiscriminatory and set in accordance with industry standards.") (citation omitted); Shell Oil Co. v. HRN, Inc., 144 S.W.3d 429, 435 (Tex. 2004) (stating that with regard to section 2305, "the drafters wished to minimize judicial intrusion into the setting of prices under open-price-term contracts[, and] that requiring sellers in open-price industries, such as the oil and gas industry, to justify the reasonableness [of] their prices in order to satisfy section [2305] would mean that in every case the seller is going to be in a lawsuit and that every sales contract would become a public utility rate case.") (citation, brackets, and quotation marks omitted).[8]  To overcome the good faith presumption in "Posted Price" cases, and to promote certainty and

_____

[8] "Although these cases involved other jurisdictions' versions of the UCC, they are nevertheless persuasive authority here[,] as the relevant provisions in their UCC statutes are substantially similar to the provisions in the Pennsylvania UCC and one of the goals of uniform laws such as the UCC is uniformity of application."  Cont'l Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1293 n.10 (Pa. 2005); see also 1 Pa.C.S.A. § 1927 (stating that "[s]tatutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them.").

predictability in commercial transactions, "allegations of dishonesty under this section must also have some basis in objective fact[,] which[,] at a minimum requires some connection to the commercial realities of the case." Shell Oil Co., 144 S.W.3d at 435-36; see also Casserlie v. Shell Oil Co., 902 N.E.2d 1, 5 (Ohio 2009) (noting that "[i]f a subjective inquiry could determine bad faith, a seller charging a fair price, even exactly the same price as another, good-faith seller, could be deemed to be acting in bad faith.").

As noted above, the evidence presented at the nonjury trial demonstrated that Peoples did not fulfill the requirements of GPC 2075 when it failed to change the "Posted Price" from "time to time." See Trial Court Opinion, 7/11/17, at 17-18. While the price may have been commercially reasonable, Peoples did not act with honesty in fact or good faith in the manner in setting the price. See id.; see also Allapattah, 61 F. Supp. 2d at 1322 (stating that the posted price presumption did not apply where the dispute involved the manner in which the price was calculated, and not the price itself). Thus, this constitutes an abnormal case, and the posted price presumption does not apply in this case. Because Peoples failed to act in good faith, Plaintiffs are entitled to damages that are based upon a reasonable price for the gas during the time in question pursuant to section 2305(c).

Here, Plaintiffs claim that in calculating a reasonable price for the gas, the market price should be utilized. See Brief for Meanor at 20-21, 22, 23; Brief for Fairman Plaintiffs at 26-27, 31-32, 33-34; see also N.T., 1/31/17,

at 95-96, 98 (wherein Plaintiffs' expert, Roach, testified to calculating damages based upon the market price of the gas during the time in question). The trial court found that market price was not a proper metric in calculating damages, as GPC 2075 called for a "Posted Price," which was neither a market price nor a fixed price. Trial Court Opinion, 7/11/17, at 22-23. The trial court noted that no evidence was presented as to a proper posted price for the time period in question, how a posted price should be calculated, the relationship between a posted price and market price, or other posted prices in the area during the relevant time. Id. at 23. The trial court concluded that based upon the evidence of record, an award of damages was speculative and could not be established with reasonable certainty. Id. at 23-24.

Upon review, we agree with the trial court's finding that the damages were not established with reasonable certainty. However, pursuant to section 2305(c), Plaintiffs were entitled to a reasonable price for the gas during the time in question, and Peoples is not entitled to shift the loss to Plaintiffs. See Spang & Co., supra. Thus, we now consider whether a new trial on damages should be granted.

"A court has discretion to hold a new trial solely on the issue of damages if: (1) the issue of damages is not 'intertwined' with the issue of liability, and (2) the issue of liability has been 'fairly determined.'" Shiflett v. Lehigh Valley Health Network, Inc., 174 A.3d 1066, 1092 (Pa. Super. 2017) (citation, ellipses and some quotation marks omitted). "[L]iability is not

- 23 -

intertwined with damages when the question of damages is readily separable from the issue of liability." Id. (citation omitted). "The liability issue has been 'fairly determined' when liability has been found 'on clear proof' under circumstances that would not cause the verdict to be subject to doubt." Id. (citation omitted).

Here, as noted above, the liability issue (the breach of contract by Peoples) has been fairly determined. Further, the issue of damages, i.e., the reasonable price for natural gas during the time in question, is readily separable from the liability issue. Thus, we vacate the portion of the Judgment awarding no damages to Plaintiffs, and remand for a new trial limited to damages. In this new trial, the parties should address the concerns articulated by the trial court regarding the calculation of damages to a reasonable certainty and price.

Based upon the foregoing, we affirm the Judgment with regard to the finding that Peoples breached GPC 2075, vacate the Judgment with regard to the award of no damages, and remand for a new trial limited to damages.

Judgment affirmed in part and vacated in part. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/2019